Let me also say I neglected at the beginning of court this morning to welcome Baruch College, the Marks School of Public and International Affairs. Good to have you here. We're ready for the next case. Good morning. May I please the Court. My name is Irv Goldman. I represent the appellant in this case, Ultimate Nutrition. The parties before the Court today maintained a 25-year longstanding business relationship involving over $30 million in whey protein purchases, which we contend gave rise to an implied and fact supply agreement. Can you articulate for me exactly what you think the implied agreement provides? It provides for the ongoing negotiation. So your argument now is that it's about process, but that was not how you argued it in the district court. Is that right? Your Honor, we, in our brief to the district court, that is how we described the... Well, what is the problem about it not being fully elucidated in the district court? The argument that wasn't fully elucidated was a statutory one that did not, the district court did not recognize the distinction between the term contract for sale as defined as requiring a contract for the sale of goods in the future as distinct from the term contract that's used in UCC 2-393. If we treat the implied agreement as one of process rather than supply, why is the UCC still governed? Well, it still relates to a contract for the sale of goods. It just doesn't require, as the definition requires, a contract to sell goods at a future time because... So the argument was section 2201, the statute of frauds doesn't apply here because this is not a contract for the sale of goods. It's just a contract. And that allows you to say that you can rely on the reasonable notice provision. Is that, was that the argument? Yes, because... That's the argument you didn't make below, right? Yes, that is correct, Your Honor. I acknowledge that. But I would urge the court to consider that in its discretion. It is a pure question of statutory interpretation, requires no additional fact-finding. And if the court does not accept our other arguments on the other counts, it could result in a manifest injustice to ultimate nutrition because Judge Hall's decision would have been upheld based on a misinterpretation of the two provisions. So I would urge the court to reach the issue. I think the UCC could also use a clarification on that particular intercede between the two sections, 2-201 and 2-309. But even if the statute of frauds does apply, we would contend that UCC 2-3093 still requires reasonable notification. That's because noncompliance with the statute of frauds doesn't render it void for all purposes, but merely prevents the court from judicially enforcing the contract. Are you judicially enforcing the contract? I mean, this notice provision is essentially a gap-filling provision in the contract that the UCC provides for an enforceable contract. And the examples in that comment that you're relying on are really about — I mean, it's clear the UCC says, these provisions say that this contract is not unenforceable for all purposes or void for all purposes. But then the examples are about things that are really to the side of the contract itself, like a third party could still be liable for inducing a term of breach of the contract. No, understood, and I acknowledge that. But those examples certainly aren't exclusive. They're examples. And just like courts have held that a contract that's unenforceable under the statute of frauds can still state an actionable COPA claim. So it may be void for the statute of frauds, but it's not void for purposes of submitting other claims. And I think that that should prevail here. We're not — you're not enforcing a contract. You are enforcing a statutory obligation that is imposed by the code. And if you look at the definition of contract, it says it's based on the party's agreement, their bargain in fact, incorporating — including course of conduct and other laws. So, again, you're not enforcing the contract, but the actual obligation under the statute to provide the reasonable notice. Even if the court disagrees with this point, the district court erred in ruling that the doctrine of equitable estoppel cannot be invoked to overcome the UCC statute of frauds. All estoppel claims without distinction between equitable or promissory estoppel are specifically preserved under UCC section-103, and they haven't been displaced by the particular provisions of section 2-201. In ruling that equitable estoppel did not apply in this case, the district court erroneously relied on two decisions that did not address that precise issue because no party raised it. And its ruling goes against the majority of cases that have considered the issue. Allowing equitable estoppel to be inserted — asserted in this context is, moreover, consistent with the UCC's obligation of good faith, as well as its policy for liberally administering its remedies in favor of an aggrieved party. Because the district court never analyzed the fact-intensive elements of equitable estoppel under Connecticut law, this court should vacate and remand for that analysis. As to our breach of contract claims based on a failure to consider our rollover requests in good faith, the evidence supported such a course of dealing, including the testimony of one Luprino executive, that it was common practice at Luprino to move customer orders from one quarter to the next. The district court, however, erroneously ruled that part of that course of dealing required Luprino's unfettered consent to a rollover. The court found that — correctly found that the delivery dates in our purchase orders were mere projections and that, ultimately, could request rollovers. Yet the court ruled that rollovers were just a series of contract modifications requiring Luprino's consent but didn't say anything about whether it had to be exercised in good faith. The district court's ruling disregards the fundamental UCC concept that course of dealing becomes part of the party's agreement, unless it's carefully negated, which it wasn't in this case. And instead — If we were to agree with that, and I'm not saying we do agree with it, but even if we do, wasn't there evidence of good faith here? I know the explanations Your Honor is speaking of. I would submit first that there are questions of fact for a jury, that the idea that they rolled over — they failed to roll over or allow a rollover from quarter one to quarter three could very well have been based on the disparaging e-mails that we say they received from one of the disgruntled customers. Melissa Rubino, who was head of procurement for Ultimate Nutrition back to 2003, so that would have been 18 years as of when this took place, testified that she noticed a marked change in Luprino's behavior after those e-mails came in. And I don't think that that is inconsequential testimony that couldn't be considered by a jury in determining whether they did indeed, in fact, refuse a rollover in good faith. As to the quarter three rollovers, there was evidence of internal e-mails between Marlena Zimmerman, the sales manager who is in charge of Ultimate's account, and other Luprino personnel going back to August 3rd and continuing to September 15th, which was the day she canceled those orders and failed to roll them over, that they were plotting internally to cancel those orders all the time to make room for Luprino's inventory for other customers. And in addition, it doesn't count for the fact that Ms. Rubino testified that on September 2nd, she had a conversation with Ms. Zimmerman, where Ms. Zimmerman said, that I am going to give you my quarter four pricing regardless of what volume you take in quarter three. She relied on that representation, and it is no coincidence that after the backroom discussions about canceling those orders, Ms. Zimmerman expressed a concern, professed a concern that she was asking for quarter four pricing. So we would maintain that that was just a pretense. She also, in her deposition, stated that she couldn't recall the September 2nd conversation she had with Ms. Rubino. So the only evidence in the record is the conversation as described by Ms. Rubino. So we would maintain that was a pretense. Mr. Goldman, you've reserved one minute of rebuttal. Did you want to use it now? Let me just turn to the CUPA claim, because I know I'm out of time. The district court erroneously dismissed Ultimate's CUPA claim by characterizing it as an entirely contract-based claim, and then held because there were no contract breaches, it wasn't necessary to consider aggravating circumstances. A fundamental error with the district court's ruling is its failure to recognize that under the unfair and deceptive acts that we've alleged, which are supported by the evidence, are actionable under CUPA independently of whether they can be sustained as breach of contract claims. As I've already gone over, the failure to provide the quarter four pricing, and it's also undisputed that the pre-no has never canceled any orders or ceased doing business with any other customer except Ultimate Nutrition for playing what they claim was a pricing game, which suggests there is some animus or improper purpose for why it's singled out Ultimate for that treatment. Does the panel have any other questions? That concludes my argument. Thank you. Good morning. I'm William Britton on behalf of Lucrino Foods. Following up on the court's questions about the new argument raised on appeal with regards to the alleged implied agreement, I would suggest that the court look at the trial record and understand that this is a new contract. What I'd suggest for the third time, if you look at the amended complaint, it's very clear count one is listed as a distribution agreement. They did that for a reason. As discovery proceeded, it became a quarterly supply agreement. Now it's, as I understand it, a process. Something completely different and raised for the first time here in a desperate effort to or at least they're presenting it as such. What do you make of that? Is it not a purely legal issue? It is not for this reason. As I understand it, and I have it quoted here what it is, it's a continuing business relationship where the parties would negotiate in good faith for the purchase of whey protein on a quarterly basis. Those are negotiations. This is not what was presented down below. And in its motion for summary judgment, Lucrino Foods put forth an affidavit of Mr. Nosler and a lot of the discovery was premised on this idea that it was either a distribution agreement or supply agreement. Now it's a continuing business relationship during the negotiations. This is something new, and I would disagree with the counsel's representation that it's a purely legal argument. Okay, so if we just assume that the contract is about prices, would they still have a viable notice claim? I'm sorry, would the If it is about, let's just assume that the contract is about a process. Yes. Would they still have a viable notice claim? No. Okay, explain why. Thank you. Because it would still fall under the UCC. Now, this contract versus contract for sale argument, if I can jump into that, because apparently they have to get a distinction between the statute of frauds, which is why the argument is being raised now of this contract versus contract for sale. The process would still involve a sale of goods. It's a negotiation relating to the sale of goods. So the UCC would apply, and therefore the statute of frauds under the UCC would apply. And, as the Court noted, if the UCC statute of frauds applies and makes it unenforceable, it's essentially void. And that's the comment to 2-201. And a void contract, I'm citing to the case from the circuit Spheer-Drake v. Clarendon National Insurance from 2001, a void contract is one that produces no legal obligation. So if the contract is void as between the parties, then there is no legal obligation under 2-309. So the idea is, if the contract is void, you can't refer to another, to a gap-filling provision or a provision that the UCC says, when you have a contract, you should give reasonable notice. You can't enforce that between the two parties, even though there may be other legal consequences that flow, often vis-a-vis third parties, from a void contract. Agreed, and that's the comment to 2-201 that the Court was asking counsel about. It says it's void for all purposes, not for all purposes, but merely prevents it from being judicially enforced in favor of a party to the contract. If ultimate nutrition is not seeking to judicially enforce this contract, why are we in court and why were they asking for monetary damages from Leprena Foods? That is exactly the definition of judicial enforcement. What about the equitable estoppel argument? Well, as I understand the equitable estoppel argument that's being raised here, it's being developed certainly more than it was in the trial court. The 2-201 has its own exceptions. Now, 1-103 of the UCC talks about the provisions that are supplanted by the UCC. Sometimes it talks about some provisions are just that common law supplemented, supplements the UCC. In this case, we're talking about a statute of frauds with the exceptions in the same provision to that statute of frauds. I propose that the statute of frauds has its own exceptions, and that's what the Court should apply, and that's what the trial court did apply. And the only exception that potentially would apply is the part performance. And clearly, because Ultimate Nutrition was cashed in advance, there had been no payment and there had been no delivery. Now, if I might, if you look at the common law statute of frauds, and this is the argument that the trial court, I'd suggest that if you look at the provisions of the common law statute of frauds, which, by the way, no court in Connecticut has yet applied the common law statute of frauds, equitable estoppel to statute of frauds, then they still don't meet it. If you review their briefs, they don't explain in any way how they meet the standards of the equitable estoppel statute of frauds. And as noted by the Glaser Court, that also includes a part performance requirement, which is not and was not met here. With regards to going to the rollover claims, as the Court noted, at the end of Q1 of 2021, this was on the back end of COVID. We're in the middle of a global shipping crisis. And Luprino Foods was requested to rollover nine loads of its best way for two quarters, and the Court noted that it had good business reasons to deny that. But we don't even need to get to the facts because the trial court correctly found, and Luprino does not dispute this, that the course of dealing between the parties indicated that the dates in the purchase orders in the pro formas were projected dates. The delivery did not have to be that day, but it had to be taken that quarter. And you didn't get paid before delivery. Payment would have to come in before delivery. And as I understand it, I believe the POs say that Luprino would handle delivery and that Luprino was responsible for the product until it was delivered in Connecticut. A small point, but it might be important down the line. In any case, Ultimate Nutrition's CEO and President testified and agreed that if a rollover was requested, that Luprino Foods had to agree to that request. Now, interestingly enough, that testimony is completely contrary to the allegations in the amended complaint. If you look at the amended complaint, paragraph 13, the allegation is if Luprino Foods was requested a rollover by Ultimate Nutrition, Luprino Foods had to consent. They'd had no discretion. The testimony by Mr. Rubino, the president, agreed that Luprino had to consent to the rollover. Now, the trial court was correct in analyzing that factual contractual situation as a request for modification to the contract. The request for modification to the contract as seen through the course of dealing. Now, 2- I'm just not sure how much that's not framing, because I think they would just say the course of dealing was that they were granted unless there was a good faith reason to say no. So where is the line between those two positions? Well, let me see if I can answer your question this way. We are in the UCC here, no question about it. We're talking about the sale of goods. If we take the trial court's, I think, correctly reasoned decision that you have an agreement with the course of dealing that says they have to take the product by the end of the quarter, and you're looking at a modification of that agreement, then you're in 2-209 of the UCC, which addresses modifications. In that provision, in the comments to that provision, it talks about good faith. And it talks about good faith in terms of the requesting party, which only makes commercial sense. Because in this case, Loprino Foods was ready, willing, and able to deliver the product at the end of Q1, for example. But Ultimate Nutrition could not or did not take it. So if you accept Ultimate Nutrition's position, it flips the script. The party, Loprino Foods, who's ready, willing, and able to comply with the contract to meet its contractual obligations, has to justify why it doesn't agree to a requested modification? That's commercially unreasonable, I propose. And I think the trial court was correct in its analysis. And under the trial court's analysis, when Ultimate Nutrition requested a rollover and Loprino Foods said no, which was its right, then Loprino Foods was within its rights in denying the rollover and essentially canceling those loads. With regards to the Cutbook claim, it's really very simple. Again, you have to go back to the complaint, the amended complaint, paragraph 53. The trial court, in its order on the motion for summary judgment and in its order on the motion to dismiss, correctly read those allegations as tied to these contracts. And, of course, in CUTPA, if there's a breach of contract, you have to have aggravating circumstances. But you have to have a breach of contract first. And since the trial court correctly found that there was no breach of contract under either the implied agreement or these rollover contracts, then there's no basis to even get to the Cutbook claim. Appreciate your time. Thank you very much. Thank you, both. We'll hear from both. I'm sorry. Oh, you might need to wait a minute already. You use your one minute. It slipped my mind. So thank you both for your arguments. Well argued. Thank you.